UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - x
                             :
UNITED STATES OF AMERICA     :  No. 3:18CR90(JAM)
                             :
       v.               :
                             :
MIGUEL MARTINEZ,          :
                             :  New Haven, Connecticut
                             :  January 28, 2019
- - - - - - - - - - - - - - - - x


SENTENCING


    BEFORE:

      THE HONORABLE JEFFREY ALKER MEYER, U.S.D.J.



A P P E A R A N C E S:


    FOR THE GOVERNMENT:

        OFFICE OF THE UNITED STATES ATTORNEY
           450 Main Street
           Hartford, Connecticut 06103
        BY:  BRIAN P. LEAMING, AUSA


    FOR THE DEFENDANT:

        JEREMIAH F. DONOVAN, ESQ.
           P.O. Box 554
           Old Saybrook, Connecticut 06475


                            Diana Huntington, RDR, CRR
                            Official Court Reporter

1                          **10:41 A.M.**

2              THE COURT:  We're here today for sentencing in

3    the matter of United States of America v. Miguel Martinez.

4              Appearance of counsel for government, please.

5              MR. LEAMING:  Good morning, Your Honor.  Brian

6    Leaming on behalf of the United States.

7              THE COURT:  Good morning.

8              MR. DONOVAN:  Jeremiah Donovan on behalf of

9    Miguel Martinez who is beside me.

10             THE COURT:  Mr. Martinez, are you doing okay

11   today, sir?

12             THE DEFENDANT:  Yes, I am.

13             THE COURT:  Any family members, supporters for

14   Mr. Martinez here?

15             MR. DONOVAN:  His dad and a cousin are here.

16             During the course of my argument, I'm hoping

17   Your Honor will let his dad get up and say a few words.

18             THE COURT:  Of course.  Certainly.

19             Please be seated.

20             So on October 16th of 2018, Mr. Martinez

21   appeared before the Court for purposes of entering a plea

22   of guilty to two charges, I believe it was Count 10 of the

23   Indictment that charged him with unlawful possession of a

24   firearm by a person who has previously been convicted of a

25   felony and I think, if I'm remembering, Count 14 charged

1  possession with intent to distribute fentanyl and heroin.

2              A Presentence Report has been prepared by the

3  Probation Office.  We have a representative from the

4  Probation Office, Ms. Lauren Harte, here today, as the

5  person who wrote the report has retired from service at

6  the Probation Office after many years.

7              So I want to make sure you understand,

8  Mr. Martinez, what I'm going to review today.

9              The first thing I'm going to do is go through

10 pretty technical matters, mostly with the lawyers and a

11 little bit with you.

12             After I'm done with those technical matters,

13 I'll hear from Mr. Donovan to make any remarks that he

14 thinks is appropriate on your behalf.  You'll certainly

15 have an opportunity, as well as your father or any family

16 members or supporters, to make any statement that you

17 wish.

18             Then I'll hear from Mr. Leaming.  And then, of

19 course, if Mr. Donovan has anything to reply, he's welcome

20 to do so.

21             Then I'll take a break, a recess, to consider

22 all that I've heard before I turn to imposing sentence.

23             Okay, sir?

24             THE DEFENDANT:  Yes, sir.

25             THE COURT:  In terms of what I've looked at,

1    I've looked at everything that's filed on the docket in

2    the case.  That principally includes the Presentence

3    Report, of course, the addendum to the Presentence Report,

4    the parties' plea agreement, financial statement, the

5    parties' respective sentencing memos, including the reply

6    that Mr. Donovan filed.

7            Anything else that the parties think I should

8    have reviewed?

9            MR. LEAMING:  I don't believe so, Your Honor.

10            MR. DONOVAN:  No, Your Honor.

11            THE COURT:  And it looks like the Presentence

12    Report has a calculation here of a final offense level of

13    15, a Criminal History Category of VI, which would

14    correspond to a recommended imprisonment range of between

15    41 to 51 months of imprisonment.  That would be followed

16    by a recommended range, I believe, of three years of

17    supervised release, and a recommended criminal fine range

18    that would be based, of course, on ability to pay between

19    $7,500 to the maximum statutory fine of a million dollars.

20    And then, because there's two counts here of conviction,

21    it would be a $200 required special assessment.

22            I will say I know that, Mr. Donovan, you wish to

23    make an argument about the overrepresentation of criminal

24    history and I know the parties have briefed that, I'd like

25    to hear about that.

1          I'm also considering, in terms of the length of

2   supervised release, whether a term of more than three

3   years would be appropriate here, something more in the

4   nature of four years, frankly, but I'd like to hear the

5   parties on that.

6          Are there any objections to the Presentence

7   Report, the facts that have been set forth in the

8   Presentence Report?

9          And I think I neglected to ask, and I'm sorry I

10  neglected to ask this, Mr. Martinez, have you read the

11  Presentence Report?

12          THE DEFENDANT:  Yes, I did.

13          THE COURT:  And the addendum to it?

14          THE DEFENDANT:  Yes, I did.

15          THE COURT:  Okay.  And have you discussed it

16  with counsel?

17          THE DEFENDANT:  Yes.

18          THE COURT:  Thank you.

19          So are there any objections to either the facts

20  or the Presentence Report's guidelines calculations?

21          MR. LEAMING:  Not by the government, Your Honor.

22          MR. DONOVAN:  No, Your Honor.  We thank the

23  probation officer and hope this probation officer will

24  convey our thanks to him if she talks to him in his

25  retirement.

1          THE COURT:  There's also part of the Presentence

2     Report, I think it's in Paragraph 76, that talks about

3     special conditions of supervised release.

4          Mr. Martinez, it's the usual course that when

5     the Court imposes a sentence, whether it's a sentence of

6     imprisonment to be followed by supervised release or

7     whether it's a sentence of probation, the Court imposes

8     pretty detailed conditions.  It imposes ordinarily the

9     standard conditions that are set forth in Section 5D1.3(c)

10    of the Sentencing Guidelines.  It also sets forth

11    mandatory conditions such as not to commit another

12    federal, state, or local offense.  Another part of the

13    conditions discussed in the Presentence Report are

14    conditions for a search based upon reasonable suspicion of

15    your home or residence or vehicle or office.  Also mental

16    health counseling, substance abuse treatment, and of

17    course a prohibition on possession of firearms, as you

18    well know.

19         Do the parties anticipate any objections or

20    concerns about those supervised release conditions that

21    are set forth in the Presentence Report and that I've

22    referred to?

23         MR. LEAMING:  Not by the government, Your Honor.

24         MR. DONOVAN:  Since I'm arguing that that's

25    specifically what the Court should do, that is we've got

1   somebody who's got kind of a disorganized life who could

2   profit from that, it's pretty hard for me to argue against

3   that.

4           THE COURT:  All right.

5           That's it, I think, in terms of the technical

6   matters that I need to cover.

7           Mr. Donovan.

8           MR. DONOVAN:  Thank you, Your Honor.

9           Should I come to the podium?

10          THE COURT:  Wherever you're comfortable.

11          MR. DONOVAN:  I think here.

12          There's two points that I want to make.  I've

13  already poured my heart out in my sentencing memo, so I

14  don't really have too much to add.

15          There are two points that are made in the

16  sentencing memos.  The first is the technical point --

17  well, technical, but really important point, and that is

18  whether Your Honor should horizontally depart in order to

19  more accurately reflect the seriousness of the defendant's

20  criminal record.

21          When I ask you to do that, I look at

22  specifically three of his convictions, and those are set

23  forth in Paragraphs 31, 32, and 33 -- I'm sorry, and

24  Paragraph 29.  First, in Paragraph 29 he was convicted of

25  a pair of larceny in the third degree charges that

1  occurred in 2003.  He describes that as he's a kid, that

2  they steal cars, they ride around Hartford, they leave the

3  cars off, and eventually the prosecutors get sick of it

4  and say, okay, you've got to plead to two of those, and he

5  did.  But it's 2003.  The judge in that case gave him a

6  fully -- in both cases, they were sentenced the same day,

7  I think, gave him fully suspended sentences.  So you can

8  kind of see that his own description of what those larceny

9  3s consist of probably is pretty right.  If it were a

10  situation where he had broken into someone's house and

11  solen things and then plea bargained the burglaries down

12  to a larceny 3, I can't see the judge giving him totally

13  suspended time for those convictions.

14             THE COURT:  It looks like maybe, according to

15  this, that he had served some time though pending.

16             MR. DONOVAN:  It could have been time served.

17  But I suppose in calculating the guidelines, you don't

18  really look at that, you look at --

19             THE COURT:  I understand that, okay.  All right.

20             MR. DONOVAN:  And so that adds 3 points.

21             And then we have a crime that occurred in 2006,

22  a failure to appear.  And then a crime that appears in

23  2007, escape in the first degree.  That's what you get

24  charged with if you just walk away from a residential

25  treatment program.  And so those add 9 criminal history

1    points.  I'm not saying you shouldn't count them at all,

2    but I think 9 overstates the seriousness of those given

3    both -- and its ability to predict future dangerousness

4    given the age of them and the nature of them.  I made that

5    argument in my presentencing memorandum.

6          The government, I think rightly -- and this is a

7    matter of concern to the Court when it sentences, well, if

8    those existed out there all by themselves and they were

9    pushing him from a Criminal History Category I to a

10   Criminal History Category IV, well, that might be a good

11   point.  But given that they're followed by other criminal

12   convictions, those later criminal convictions give added

13   value to the past criminal convictions.

14         And this kind of flows into my second argument.

15   And that is there's something a little bit off about this

16   defendant.  And I can't quite put my finger on it.  He's

17   an affable guy.  He's not one of those guys that you go

18   out to Wyatt, "What's going on with my case, man."  Not

19   like that at all.  He's affable.  When the government made

20   its plea offer to us, he didn't balk at it.  He wasn't

21   like that at all.  He only has a sixth grade education,

22   maybe a seventh grade education.  It's hard to tell

23   because we haven't been able to get the Waterford school

24   records, I know we haven't been able to get the Waterford

25   school records.  As I say in my memo, you know, Abraham

1    Lincoln only had a fifth, sixth grade -- I don't know if

2    he had a fifth or sixth grade education, yet he's one of

3    the smartest of our political leaders who ever served.

4    That's not this defendant.  You have some people who have

5    really low levels of education but really active, I call

6    it a feral intelligence, an acute intelligence as to

7    practical things, greater practical intelligence than I do

8    with all of my education.  But that's not him.  That's not

9    him.  He's someone who leads kind of a disorganized life.

10           He's a kind of a street guy.  You can see in the

11   Presentence Report sometimes he's living with his

12   girlfriend and the children he's had with her, sometimes

13   he's living with his mother.  His mother is also kind of a

14   street person as well.  Living on the Berlin Turnpike in

15   motels with his mother, which must be a difficult

16   situation.  And sometimes he's living with his father.

17   His father is a really decent guy, he works hard, has

18   worked hard all his life.  He's got a brother and sister,

19   all of whom have done well.

20           But there's something a little off.  His life is

21   disorganized.  You can see it in the convictions he's got.

22   It's the convictions that you get with street people.

23   They're supposed to be in court, they don't appear.

24   They're supposed to be in a halfway house, they don't stay

25   there.  And part of it has to do with some kind of -- it's

1    hard for me to put my finger on the psychological

2    difficulty he has.  And I'm not sure that it's really

3    psychological treatment that is so important.  More like

4    life skill treatment, life skill help.  You know, how to

5    pay bills, how to set up a checking account, how to live

6    with your children and the girlfriend.  He adores his

7    girlfriend.  And every meeting I have with him he's

8    talking about his kids, how the kids want to Skype him and

9    they can't do that in prison.  And he doesn't want them

10   brought to prison because it would be terribly traumatic

11   for them.  Boy, that's the way I'd feel as well.  But

12   there's just something a little bit off about him.

13          And so --

14          THE COURT:  He's had a diagnosis, I know,

15   bipolar more than ten years ago.  But no ongoing

16   medication, I take it?

17          MR. DONOVAN:  Right, right.  It's hard -- I'm

18   not a -- nobody really should rule on my diagnosis.  You

19   can kind of -- everybody who has been in the criminal

20   justice system can kind see a schizophrenic when you see

21   one, sees one who is bipolar.  I don't really see that,

22   but it's -- but it could well be.  That could well be it.

23          But the reason I guess I don't see it, I don't

24   see in his criminal history evidence of bipolar.  I don't

25   see him going for six months without an arrest and then

1   all of a sudden engaging in frenetic criminal activity,

2   and then six more months without an arrest, and then more

3   frenetic activity.  His criminal activity tends to be

4   stuff like walking away from a halfway house and failure

5   to appear and possession of drugs.  I see the

6   psychological problem that I see in Miguel more than any

7   other is dependence on drugs.

8          And this case has been so disappointing for me

9   because I really tried hard with Magistrate Martinez to

10  get her to let him out.  And she did.  She took a chance

11  on him.  And then a couple months later he was selling

12  drugs -- he's alleged to, because we have that case

13  pending, so he's alleged to, but the evidence is quite

14  strong that he was selling drugs on the streets of

15  Hartford.

16         THE COURT:  And he was arrested for that, and I

17  don't think he told the Probation Office, as I recall.

18         MR. DONOVAN:  Yeah.  He had an explanation.

19  Because his dad called me as soon as that happened.  And I

20  said, "Make sure you call the probation officer."  What

21  happened was -- I know what happened.  He says that the

22  police officers told him we're calling the probation

23  office.  And he told the police officers, I think, that he

24  was out on pretrial release in federal court.  And they

25  said we're calling the federal court and letting them know

1    about that.  So he thought it had been done.  But he --

2    actually, I should have done it, because his father said

3    make sure to tell them.  And I probably should have done

4    that as well.  But I didn't.

5              THE COURT:  Okay.

6              MR. DONOVAN:  So I'm hoping Your Honor -- as I

7    argue in my sentencing memo, Your Honor's always concerned

8    about the importance of a sentence in promoting respect

9    for the law.  And promoting respect for the law in the

10   sense of deterrence, that is specifically this guy to

11   respect the law and generally deterring people who are in

12   his kind of same situation to respect the law.  Obviously,

13   if you would sentence him to a fully probationary

14   sentence, then people who hear about that might say to

15   themselves, hey, you know, what happened to Miguel, maybe

16   if I get arrested, the same thing will happen to me.

17             But I think that if you agree with our argument

18   that you should horizontally depart, that gets you down to

19   I think a guidelines range of 30 to 37 months, I think

20   that someone similarly situated to Miguel looking at a

21   three-year sentence in that case, will not have any

22   disrespect for the law.  They'll say, I know Miguel -- if

23   they knew Miguel, "I know him, he's kind of a street guy,

24   he's not quite all there.  They give him around three

25   years, that's a fair enough sentence."  So I think that

1    kind of sentence would promote respect for the law.  It

2    wouldn't deter as much as if you gave him a life sentence,

3    that's for sure, but would have the necessary deterrent

4    affect that's called for by the sentencing statute.

5         But I really think that in this particular

6    situation Your Honor has the opportunity to really do some

7    good in your sentencing.  The good that Your Honor does in

8    many of your sentencings is just isolating somebody from

9    society, that's a good that you perform for all of us.

10   There are some guys that it's good that we don't have to

11   have contact with.

12        And the good that you perform in other cases is

13   you express the outrage of the community with respect to

14   the crime that was committed and you limit the opportunity

15   for revenge, you know what I mean?  By sentencing harshly

16   sometimes you're removing somebody from society and

17   preventing the relatives of the victims or the general

18   public who is infuriated at this particular person from

19   taking revenge and starting some endless cycle of revenge,

20   that's the good you do.  You don't have to do that in this

21   case.  I think in this case the good you could do is

22   taking this kind of directionless, disorganized, probably

23   psychologically troubled, to some degree, defendant and

24   maybe setting his life on a correct path.

25        He does want to speak with you, but before he

1    does, could maybe I have his dad speak?

2            THE COURT:  Of course.

3            MR. DONOVAN:  I'm going to ask his dad to come

4    up to the podium.  You know how I do this, sometimes I'll

5    ask him questions.

6            THE COURT:  That's fine, however you feel

7    comfortable.

8            MR. DONOVAN:  First of all, tell the Judge who

9    you are and what your kinship is to Miguel.

10           MR. MARTINEZ:  I'm Mr. Miguel Martinez, I am the

11   father.

12           He passed through a lot of bad life.  He's

13   running away from drugs.  And I take care of my kids.  I

14   be a mother and father.  Working hard.  He know I do the

15   best I can for my son.  He's a nice guy, but the

16   situation, mother never give you some love or nothing, he

17   goes that way.  He needs some help.

18           MR. DONOVAN:  Where do you work?

19           MR. MARTINEZ:  I work for Jacobs Brake System in

20   Bloomfield.

21           MR. DONOVAN:  Better spell that for the court

22   reporter.

23           MR. MARTINEZ:  Jacob, like the name.  Jacobs

24   Brake Systems.

25           MR. DONOVAN:  Okay.  And that's in Bloomfield.

1    You've worked there for a long time, right?

2              MR. MARTINEZ:  I worked over there for almost 30

3    years.

4              MR. DONOVAN:  Your son also works with you

5    there?

6              MR. MARTINEZ:  Yeah.

7              MR. DONOVAN:  Why do you think that son has

8    turned out fine and Miguel turned out the way he is?

9              MR. MARTINEZ:  Mentally Miguel got problem.

10   When he got three day old, when he was a baby, he got

11   meningitis.  He almost died.  He went in the hospital for

12   18 days.  From there his mind is up and down, up and down.

13   And then his mother don't give him the right education.

14   The mother running away for another man, left me in my

15   house.  So then that thing hurt me a lot.  So I keep

16   fighting to study for my kids.  At that time Miguel is

17   grown and stealing bicycle, this and that, in Willimantic

18   when he lived with his mother.  And then he got arrested

19   and put in residential.  And Waterford Country School, he

20   be over there for four years.  And then I go over there

21   and get Miguel to my house.  And then his mother got

22   arrested because she helping somebody out.  She got two

23   years in jail.  And then I fighted for custodian court in

24   Hartford and they give me the custody of the kids.  It's

25   hard for me because I working too many hours, keep

1    watching him all the time.  A lot of time he blame me.

2    Sometimes he say, "You don't be good father.  You don't be

3    good father, you don't spend too much time with me."

4    "Miguel, I don't got no leave.  I got to work.  I got to

5    make money to keep you going."  Sometimes he don't

6    understand that.

7              MR. DONOVAN:  With respect to being a good

8    father, I should point out that when Magistrate Martinez

9    released him on bond, she required it be a real estate

10   bond.  Miguel Sr. put up his house.

11             MR. MARTINEZ:  He's a nice guy, I know that.  He

12   respect me a lot and he go my way, but he go on the

13   street, he don't got no money.  A lot of time he go on

14   probation.  "I need some work, I need some work."  But the

15   probation said no, you got to be home early.  He started

16   working a car wash.  He told me, "Pappy, I got to stay

17   over there to 7:00 working."  I said, "You keep your

18   4:00."  So he say, "I got kids to feed, I got to buy some

19   clothes, I got to buy my cigarettes, this and that."  I

20   said, "Yeah, but you got to follow the rule."  He got

21   arrested in Hartford, I told him, "Did you call the

22   probation?"  He said, "No, I don't call the probation."

23   So I can't call the probation because I don't got the

24   phone number for the probation officer.  I got his number,

25   and I called the lawyer and I let him know what's going

 1  on.

 2          MR. DONOVAN:  Anything else?  I don't know if

 3  the Court has questions.

 4          THE COURT:  I have a couple of questions.

 5          What job possibilities do you see for Miguel in

 6  terms of working?

 7          MR. MARTINEZ:  What he can do?

 8          THE COURT:  Yes.

 9          MR. MARTINEZ:  He can work anywhere, make money,

10  clean money, go home.

11          THE COURT:  Have you talked to him about that in

12  terms of --

13          MR. MARTINEZ:  He told me all the time.  First,

14  a long time ago, he got disability from the State for

15  mental problem.  When he come out of the program, I said,

16  "Miguel, you want to apply again?"  "I don't be crazy, I

17  don't be crazy.  Why I got to go over there?  I don't be

18  crazy."  I said, "We got to look for a job."  "Pappy, I

19  got felony.  All the time put in my application, they deny

20  it.  They don't want to give me work."  So...

21          MR. DONOVAN:  One of the things he did before he

22  was arrested, he was working at Dunkin Donuts.

23          MR. MARTINEZ:  Yup.

24          MR. DONOVAN:  He would go there like early in

25  the morning and help making doughnuts.  He's the guy that

1   you see on the ads.

2           MR. MARTINEZ:  He work at Dunkin' Donuts.

3           MR. DONOVAN:  He worked there for about six

4   months, nine months or so?

5           MR. MARTINEZ:  I do want to lie to you, I don't

6   got any idea.

7           MR. DONOVAN:  That was a menial job.  It was

8   mixing dough.

9           MR. MARTINEZ:  At that time he live in Hartford

10  and I live in East Hartford.  I run away from Hartford.

11  Hartford too many crime.  People stealing stuff from me,

12  my snowblowers and that.  I had a stroke 2014.  2014 I go

13  to work 5:00 in the morning.  My mouth go this way

14  (indicating), my nose.  I lost power right here, my leg.

15  I got to clean the snow, I got to clean the ice, I got to

16  do everything.  I don't know where's Miguel.  Mother and

17  father, he know that.  I like to help him like go to the

18  drug treatment and mental.  He's a nice guy.

19          MR. DONOVAN:  One of the things I was hoping was

20  while he was out -- the pretrial services officers are

21  tough, which is great for me in trying to get people on

22  bond, because they exert some control over them.  It's

23  just when they come to a sentencing and the person hasn't

24  made use of that, I'm not in as good a position.  But what

25  they had done is they had arranged -- first of all, he

1   couldn't get a job when he first got out because they

2   wanted him to go through some intensive drug treatment.

3   He was a junkie, he needed that.  But then they were about

4   to send you to a job fair, right?  There was a job fair

5   that was scheduled like maybe two weeks after his arrest

6   that he was supposed to go to.  I talked in my presentence

7   memorandum about this silly conversation I had with him.

8   You kind of repeated it.  "I need to get a job where I can

9   stay out in the evening but -- I may get a job where I can

10  stay out in the evening but I can't do that because I got

11  a curfew."  I said, "Well, once you get the job, you can

12  be sure the Judge will let you will stay out."  "Yeah, but

13  I can't get the job."  And we went back and forth and back

14  and forth.  There's something not quite right here.  He's

15  not quite getting this.

16          But anyway, that was one of the sadnesses that I

17  had was that they had him arranged to go to a job fair and

18  to try to get some kind of -- even to start off at a

19  menial job, as his job at Dunkin' Donuts was, that can

20  lead to something else.

21          THE COURT:  Right.

22          MR. DONOVAN:  But, you know, Your Honor, if you

23  look at the Presentence Report and come to the conclusion

24  that he doesn't have a long job history, I have a hard

25  time arguing with that.

1          THE COURT:  I guess the real issue is, is he

2     going to have one in terms of trying to figure out what

3     does it take for him to ultimately get to the point where

4     he's working a job and not, as he says, you know, living

5     off the streets, essentially.

6          MR. DONOVAN:  You know, one reason that I think

7     he might is because of the way he feels about his kids.

8     And he talks about wanting to support them, about wanting

9     to give them a life different from his.  But one of his

10    kids now is like following in the same footsteps.  I don't

11    know if that's a hereditary kind of mental problem or if

12    it's just the environment in which the child is being

13    raised.

14          MR. MARTINEZ:  Yeah, I'm sorry.  Right now I got

15    scared, because he got one daughter same way as him.  Same

16    way.  It's like 12 years old, right?

17          THE DEFENDANT:  Thirteen.

18          MR. MARTINEZ:  Thirteen.

19          Come over here, talks the screen, talks this,

20    talks that.  Go to my house.  I said, "Please, take it

21    easy.  Slow down.  Sit down.  Go eat something."  A few

22    seconds go jumping over there.  They be in the pool,

23    running over there.  "Amaya, you got to slow down."  I

24    think they want to be the same way to Miguel.  Sorry,

25    but...

1          THE COURT:  Right.  So how often do you see

2    Miguel in recent times before the arrest?

3          MR. MARTINEZ:  I live in East Hartford, and I

4    have to go to Hartford.  I work so many overtime.  And I

5    look for him.  I go to his house.  Miguel run the bicycle

6    around, he don't got no car, no nothing.  I pay the money

7    to get -- for a license.  I spent $350.  I said, "Miguel,

8    let's go to the school.  I want to buy you a car, a pickup

9    truck, do scrap metal, something you can find money."  So

10   I make appointment, I go with Miguel.  I pay the $350.

11   Then the person at the school told me this license, this

12   money is guaranteed.  They have a license coming out for

13   this.  So we make a appointment.  And said, "Miguel, when

14   you go over there?"  "Okay, Monday we start."  I go to

15   work and I think Miguel go over there.  "You go to

16   school?"  "Yeah, I go to school."

17          So the day to the appointment, I bring my car.

18   I say, "I'm ready, my son got to have a license."  We go

19   over there.  He failed the test.  So the driver school, I

20   say, "What's going on over there?  You told me."  "Miguel

21   never come over here."  I said, "Really?"

22          So I lost my money and he never got a license.

23          MR. DONOVAN:  So when Mr. Martinez released

24   Miguel on bond, he was staying at your house?

25          MR. MARTINEZ:  Yeah, stay at my house.

1          MR. DONOVAN:  And he was complying with the

2    requirements, right?

3          MR. MARTINEZ:  Yeah.

4          MR. DONOVAN:  Then you saw him every day.

5          MR. MARTINEZ:  Uh-huh.

6          MR. DONOVAN:  This period where he was supposed

7    to go to driver's school and failed to go, was that --

8          MR. MARTINEZ:  No, that's in the past.  Couple

9    years ago.

10          MR. DONOVAN:  And then prior to his arrest in

11   this case, right, you were the one who actually brought

12   him down to the police station --

13          MR. MARTINEZ:  Yes.

14          MR. DONOVAN:  -- in order to turn himself in.

15   You called him and said the federal agents have been out,

16   said, "Look, you got to turn yourself in."  And you went

17   down.

18          MR. MARTINEZ:  I been to the Hartford Police

19   Department.  And I feel bad because I have my son over

20   there.  I said, "I bring my son over here.  I think

21   somebody looking for my son."  And the lady looked in my

22   computer, "No, we not looking for nobody."

23          MR. DONOVAN:  She was looking at the state ones.

24          MR. MARTINEZ:  "We not looking for Miguel here.

25   You got no case right here."  I said, "I see somebody was

1    looking for Miguel."  So I don't know what kind of

2    communication.  We over there like half hour to look at if

3    they looking for Miguel or not.  So then later on they put

4    the handcuffs and take him.

5              I say, "I come over here to be honest with you

6    and you say Miguel don't have no case.  If my son a

7    criminal, they got to pay for whatever they do.  So why

8    you guys told me?  You got to have good communication with

9    FBI, whatever, that way they looking at the person, they

10   can be arrested right away."

11             MR. DONOVAN:  Prior to that when he got arrested

12   that time, how often would you see Miguel?

13             MR. MARTINEZ:  When I drive in Hartford, I see

14   him driving around the bicycle.  But I don't like to stop

15   in the bad neighborhood.  I'm -- I want to turn 53.  And I

16   got scared.  Somebody grab my money or -- I'm not the kind

17   of person in trouble.  I see a street not too good, I like

18   to go see my son, but when I see people running here and

19   there, makes me scared to go see him.  We talk on the

20   phone a lot of time.  But he know where I live.  And I

21   like to give him help, have him stop at my house.  I don't

22   like to go to Hartford.  I get scared in Hartford.  I

23   don't feel secure there really.

24             THE COURT:  Do you have anything else you want

25   me to know?

1            MR. MARTINEZ:  Sorry, sir?

2            THE COURT:  Is there anything else you want to

3 tell me?

4            MR. MARTINEZ:  Not really, everything is okay.

5 He know I love him a lot.

6            THE COURT:  Thank you, sir.  Thank you very

7 much.

8            MR. MARTINEZ:  Thank you.

9            MR. DONOVAN:  Could Miguel speak to you as well?

10            THE COURT:  Certainly.

11            MR. DONOVAN:  Is there something you want to say

12 to the Judge?

13            THE DEFENDANT:  I want to say I'm sorry, you

14 know, for causing all this trouble to my family, my wife,

15 and my kids.  I know it was my addictions.  My addiction

16 got me to the wrong path, you know.  I never got guidance.

17 I never did treatment.  I know I'm responsible for the

18 crimes that I committed.  I'm not denying nothing else,

19 you know.

20            I just want to say I'm sorry, you know.  I had a

21 rough child life.  I grew up on the street by myself.  I

22 know it's my responsibility to live for my family, but I

23 wanted to become a man to myself and be supportive to my

24 family, but I took the bad road to do the stuff that I

25 chose to do.

1         THE COURT:  I see what you mean.

2         MR. DONOVAN:  When we were talking about what

3    you would say to the Judge, I told you that everybody gets

4    up here and says I want to apologize to my family, I had a

5    bad life, I was addicted to drugs, which is just what you

6    said.  Why are you any different?

7         THE DEFENDANT:  I'm tired of this life.  I want

8    to become somebody different for my kids.  Right now my

9    daughter is 13 years old.  She's been suspended in less

10   than a year 25 times.  She takes seven different

11   medications.  I don't want her to go through the same path

12   that I'm going through.

13        MR. DONOVAN:  Maybe it would be better for you

14   to be in jail and not be around her, don't you think?

15        THE DEFENDANT:  Well, if I deserve it and, you

16   know, I accept responsibility.  But I don't -- I don't

17   want her to go through the same path as me.

18        MR. DONOVAN:  You got a pretty good relationship

19   with her mother, right?

20        THE DEFENDANT:  Seventeen years with my wife.

21        MR. DONOVAN:  When you get out, okay, where will

22   you live?

23        THE DEFENDANT:  I'll try to go back with my

24   wife.

25        MR. DONOVAN:  Will she take you back?

1           THE DEFENDANT:  I don't know.  After this case,

2     I don't know if she's going to be supportive of me.  Right

3     now we're going through some difficulty.  She told me --

4     she told me that this wasn't the right decision by going

5     to get money, you know, selling drugs.  She told me to go

6     get a job, but my ignorance.

7           MR. DONOVAN:  You're talking about after.  So

8     when you got -- when Magistrate Martinez let you out, she

9     had a long talk with you and said, "Listen, you got to

10    change," right?

11          THE DEFENDANT:  Yeah, she told me.

12          MR. DONOVAN:  And you didn't.

13          THE DEFENDANT:  And I didn't.

14          MR. DONOVAN:  Now you're not sure she's going to

15    take you back?

16          THE DEFENDANT:  I'm not sure.  I don't think so.

17          MR. DONOVAN:  You communicate with her from

18    Wyatt, though, right?

19          THE DEFENDANT:  Yeah, I communicate to talk to

20    my kids.  My six-year-old tells me, "I'll tell the cops to

21    let you go.  I'll tell them to let you go so you can come

22    home and give me a hug."  I said, "Daddy did a boo-boo."

23    "But why you got a boo-boo?"  I don't like to explain to

24    her in detail because she's so small.  So I let her know

25    that I'm in a program.  She's like, "No, you're not.  You

 1    in jail.  They told me you're in jail.  So come home."  I

 2    said, "I can't come home right now because, you know,

 3    daddy did some boo-boo."  "But you're not hurt, you're

 4    talking to me.  You're fine."  I don't got no explanation

 5    to tell them.  None of my kids.  My oldest know already

 6    because she's already 13.

 7          My wife kept telling me over and over to leave

 8    the street life.  I was ignorant and my addiction was too

 9    strong, and I kept going back to the streets to support my

10    addictions and support my case.

11          MR. DONOVAN:  How about Judge Meyer's question

12    to your dad about what job could you get?

13          THE DEFENDANT:  Excuse me?

14          MR. DONOVAN:  What about Judge Meyer's question

15    to your dad about what kind of job could you ever get?

16          THE DEFENDANT:  I know a little bit about music,

17    installing car music.

18          MR. DONOVAN:  Installing car radios?

19          THE DEFENDANT:  Yeah.

20          I worked on delivering pizza before, but my job

21    only lasted for like three months, three to six months.

22    That was the longest.  I never filed taxes.  Never seen a

23    real paycheck.  Everything is cash.

24          MR. DONOVAN:  Why did you only last three

25    months?

1          THE DEFENDANT:  Because -- I don't --

2          MR. DONOVAN:  You wouldn't appear for work and

3     stuff?

4          THE DEFENDANT:  Either car issue or my addiction

5     just led me to go back to the streets.  Since I wasn't

6     getting paid enough over here, I was going back to selling

7     drugs to get high.  Bad decision.  Hanging around bad

8     people.

9          MR. DONOVAN:  Anything else you want to say to

10    the Judge before he makes his decision?

11         THE DEFENDANT:  I'm sorry, you know.  You will

12    never see me in your court ever again.

13         MR. DONOVAN:  I don't know if Your Honor wants

14    to ask him questions.

15         THE COURT:  So you said you were addicted.  What

16    drugs are most addicting to you?

17         THE DEFENDANT:  OxyContin, oxycodone.  My

18    brother had killed himself two years ago and made it

19    worse.  I just started getting more higher and higher and

20    higher.  Just to forget about the pain and suffering.

21    Never been in a family gathered up, my mom, father.

22    Everything is the street, is my kids and my wife.  That's

23    all I know.

24         THE COURT:  So what's your plan in terms of

25    making sure you don't go back to OxyContin?

1          THE DEFENDANT:  Go out for therapy and go out

2     for help.  Don't give up.  Keep fighting for my life,

3     everything, you know.

4          THE COURT:  And in terms of jobs, you talked

5     about doing something like working with cars would be a

6     possibility.

7          THE DEFENDANT:  I want to go for -- see if I can

8     go for maybe mechanic or auto body.  Something that will

9     get my attention.

10          THE COURT:  So no matter what sentence I impose

11     today, it will be followed by, I'm sure Mr. Donovan has

12     explained this to you, some very rigorous conditions that

13     basically will include a lot of drug testing.  If you're

14     back on drugs, it will be pretty clear, should be pretty

15     clear then.  Do you understand that?

16          THE DEFENDANT:  Yes, I do.

17          THE COURT:  Because it just means you'll end up

18     coming back into court again.

19          THE DEFENDANT:  I don't want to deal no more

20     with the system.  I've been dealing with the system since

21     the age of seven.  I'm 34.  I'm not getting anything out

22     of it, but keep coming back and keep coming back and

23     losing time with my kids.

24          MR. DONOVAN:  We talked about how federal

25     supervised release, it's not like state probation where

1    you can kind of slip by and come back with three or four

2    dirty urines.  They bring you back to court and the Judge

3    sends you back to jail for a while, maybe not really a

4    long, long time, but sends you back for a while, lets you

5    out again.  If you do it again, he sends you back again.

6    We talked about that, right?

7              THE DEFENDANT:  Yes, we did.

8              THE COURT:  Is there anything else you want me

9    to know?

10             THE DEFENDANT:  Not right now.

11             THE COURT:  Thank you.

12             THE DEFENDANT:  Thank you.

13             MR. DONOVAN:  I don't think I have anything else

14   to say.

15             THE COURT:  Thank you.

16             Mr. Leaming.

17             MR. LEAMING:  Thank you, Your Honor.

18             Much of what I put in the government's

19   sentencing memorandum is still sort of how I feel even

20   after hearing Mr. Martinez's comments.  And it's often the

21   case, in fact almost every case the defendant is

22   remorseful, earnest in their words to the Court that they

23   want to change.  Nobody wants to be here, right?

24   Especially for first-time federal offenders, in my

25   experience, there's a lot of uncertainty about even

1   somebody who has been in jail multiple times in the state

2   system, they sort of know what to expect.  In all

3   likelihood, you know, people from their neighborhood or

4   associates will be in the same facility that they're

5   likely to be sent to in the state system.  Connecticut's

6   not that big.  I'm sure Mr. Martinez's anticipation of

7   today is where will I go?  How far away will I be?

8   There's a high probability he won't know anybody.  There

9   may be people from Connecticut in the facility, but it's

10  highly unlikely he'll know any of them.  So it's

11  understandable that the mindset that he would have is I

12  don't want to do this again.  I don't want to come back

13  here.  I don't want to spend my life going in and out of

14  the criminal justice system.

15          I think, unfortunately for Mr. Martinez, is that

16  he had that chance.  And as I indicated in my sentencing

17  memorandum, I argued strongly against his release.  I

18  brought to the court's attention facts that she was well

19  aware of.  We have a man out there selling deadly drugs

20  and he knows they're deadly drugs.  He's selling a gun

21  that he knows was used in a pistol whipping, that he's

22  associating with Latin Kings and living on the streets.

23  He's a real danger to the community if we let him out.

24          There was also a strong argument that I made

25  that we didn't really know where he was.  As he even

1     indicated in his presentence interview, he's living on the

2     streets.  It's not like you look him up in the phone book

3     and find out where he lives.  There's no continuity in his

4     life.  Obviously, I think some of the factors that swayed

5     Magistrate Judge Martinez was his father.  His father is

6     willing to secure the bond with his house, that he's

7     willing to take him in and try to get him a job, try to

8     give him that chance which he so strongly argued for.  And

9     it didn't take long for him to go back.  And it's not

10    surprising to me.  It wasn't surprising to me.

11          And obviously at some point he's going to come

12    back out and we're going to have to take another chance.

13    There will be conditions imposed and there will be a

14    probation officer supervising him.  But the mindset is

15    different too.  The mindset on supervised release is

16    you're there to try to help him.  The thought is that you

17    served your penalty, whatever time imprisonment that was

18    imposed, and that supervised release is more for

19    rehabilitation.  So while it's important that the

20    defendant knows that his behavior and conduct will be

21    closely monitored, I don't often take the view that that's

22    sufficient, to give a lesser sentence because of that.  I

23    think the sentence to be imposed has to reflect the

24    seriousness of his offense and, in the government's view,

25    it was very serious.

1        In many ways he's fortunate.  I did contemplate

2   at the time that the close connection between the firearm

3   and the drugs could have justified charging him with an

4   offense that carried a mandatory five-year prison term.

5   He's also fortunate that the investigation so quickly

6   moved from some of the street dealers that were selling

7   Mr. Velez's drugs to Mr. Velez.  We don't often get to go

8   to the top guy so quickly.  What often happens is a lot of

9   those sort of second-tier dealers, their quantities go up

10  pretty substantially because the investigation will stay

11  more focused on them for a longer period of time.  It

12  doesn't really sort of change who Mr. Martinez is.  He's

13  always going to be that street-level dealer who is getting

14  stuff from this guy and selling it on the street.  Whether

15  we did it for two weeks or two months, it would have shown

16  him to be the same person.  But the fortunate part is that

17  the quantities could have easily triggered mandatory

18  penalties and he would have been probably arguing to get

19  to that point.

20        So I think that the Sentencing Guidelines range

21  here is certainly minimally necessary, I think, to achieve

22  the sentencing factors.

23        As to the defense's argument about horizontal

24  departure, I don't think that's justified.  Obviously

25  everybody that comes into court, everybody looks different

1   to a degree.  And the departure standard here I don't
2   think has been met for a couple reasons.  One, I look at,
3   for example, the three points he got on the larceny 3 and
4   I look at person who had a juvenile record for arguably
5   similar conduct.  I see somebody who gets arrested for it,
6   and while they're out on bond gets arrested for it again.
7   I see someone who gets a break and gets a suspended
8   sentence because he's 19 and had never received a
9   conviction as an adult before, but then violates and gets
10  sent to prison for two years.  To me, that's worthy of 3
11  points.  It is a serious offense.

12          I can't remember if it was the case that had
13  Your Honor -- one of the things you don't often see in
14  large part due to the age of some of the convictions is
15  that I don't view joy riding as a minor offense.  If you
16  talk to any Hartford police officers even today, it's a
17  tremendously challenging problem.  Especially among the
18  juvenile population.  Where it's almost like a right of
19  passage where not only are we seeing many cars being
20  stolen, but it's not just they're joy riding, they're
21  engaging police in pursuits.  I recently had a gentleman
22  who killed his friend when he was fleeing police in a
23  stolen car and spent four years in jail for that.  And so
24  it's not a minor offense.  And it's not something when you
25  look at it saying Criminal History VI substantially

1    overrepresents the seriousness of his history.  I look at

2    criminal history categories, is it predictive of the

3    dangerousness to the community, to the deterrence?  And

4    while we look at things like walking away from a halfway

5    house or failing to appear in court as relatively minor

6    compared to other crimes, it reflects here someone who

7    isn't deterred, who doesn't really respect the law,

8    certainly doesn't care enough to -- I think the walkaway,

9    he was out for four days before he's like "I don't need to

10   do this."  We sort of have the same conduct here where you

11   give him another chance and he wastes it.

12            So I think when I ask for a sentence of 41

13   months, it's not only to promote the respect for the law

14   for the seriousness of the offense, it's that we've got to

15   send the message to him: your conduct is worthy of a

16   lengthy sentence.  And I don't think the message is sent

17   if we say we'll give you something less than what the

18   guidelines would recommend in this case.  Certainly his

19   actions have, I think, spoken much louder than the words

20   that he says today in court and in the sentence interview

21   with Probation.

22            For those reasons, Your Honor, I think a

23   sentence of 41 months is a necessary sentence.

24            THE COURT:  Thank you, Mr. Leaming.

25            Mr. Donovan, anything else?

1          MR. DONOVAN:  No real response.

2          I didn't say during the course of my initial

3     remarks, but I said in the sentencing memo, I don't think

4     he'll be able to get into the residential drug treatment

5     program because of the gun count.  I would like the Court

6     to make that recommendation because that would be really

7     good for him.  I guess my request with respect to a

8     recommendation as to where he should be sent would be the

9     nearest place to Connecticut that has a residential drug

10    treatment program.

11          THE COURT:  All right.  So I'm going to take a

12    brief recess, ten minutes, and return at quarter of the

13    hour according to the clock up there.

14          Stand in recess.

15              (Whereupon, a recess followed.)

16          THE COURT:  Please be seated.

17          Mr. Martinez, I'm going to turn at this time to

18    the imposition of sentence.  I want to talk to you about

19    what I've considered before I do that.

20          Under the law, I'm required to consider a number

21    of factors.  Basically, I have to think about everything I

22    know about you and your life, everything, your family.

23    And also think about what it is you've done wrong, of

24    course, that brings you into court.

25          I have to think about the purposes of

1    sentencing.  We've talked about some of those purposes

2    already, as you know.  One of them is what's a just

3    punishment for doing something like getting involved with

4    drugs or guns.  Another part is what reflects the

5    seriousness of the offense and what will promote respect

6    for the law.  You heard Mr. Donovan talking about that.  I

7    also have to, apart from that, think about what would

8    actually discourage you or deter you from going back

9    again.  You heard Mr. Leaming talking about that.  I have

10   to think about deterring and discouraging others.  And I

11   have to think about what the law calls rehabilitation.

12   Basically what can be done to make sure that you -- give

13   you structure in your life, whether it's substance abuse

14   treatment, mental health counseling and the like, anything

15   else, frankly.  Job help, those kinds of things, I have to

16   be thinking about that.

17           I have to consider what the Sentencing

18   Guidelines would recommend.  We've talked about those,

19   they're technical, mathematical, but I do think about what

20   the Sentencing Guidelines suggest.

21           And I have to think about the need to avoid

22   basically unwarranted differences in the type of sentence

23   you might receive and the one that would be imposed to

24   someone in similar circumstances as you in another

25   courtroom.

1        Basically, I have to think about everything I

2    know about you, both the "good" and the "not so good," and

3    to decide on a sentence that's fair and just and

4    reasonable but also one that's not greater than necessary

5    to serve the purposes that I just talked about of a

6    sentence.

7        For you, you've heard the concerns already.

8    Everybody knows that you decided to get involved with at

9    least some level of drug dealing.  It might have been

10   more.  Mr. Leaming has suggested it could have been.  But

11   I'm looking only at what I know and we have before us in

12   terms of what you decided to get involved with.  And you

13   kind of got involved with kind of the worst of it, right,

14   because you told me you use oxy and OxyContin, and that's

15   bad enough.  But fentanyl?  Right?  That's killing people,

16   you've got to know that.  It's the leading cause of

17   overdose deaths in the state and nationwide.  You knew it.

18   It was clear in terms of what you were telling the people

19   that you were selling that to.

20       I've got to think about, in some ways even more

21   troubling, the firearm.  I don't know anything about the

22   pistol whipping that you talked about there, but what are

23   you doing with a gun?  Selling or transacting with a gun.

24   So there's a good reason why you were subject to

25   prosecution for that, for getting involved in that kind of

1   activity.

2          And you know, not being first time in court by

3   any means.  Much of your problems, I know, go back to

4   those earliest, very early days.  But you put it yourself,

5   you told Probation Officer Myers, I'm quoting what you

6   told him, "All I know is the streets."  And that's good

7   you're candid about it.  But that's a concern, again, in

8   terms of my thinking, well, are you going to go back and

9   just do this again?

10         Mr. Leaming makes much of the point, and it's a

11   good point, you got a break.  Judge Martinez decided to

12   give you some benefit of the doubt.  And you, as you told

13   me, decided not to take advantage of that.  So that's

14   another concern I have.

15         On the other side of the coin, I'll say there's

16   some things that weigh in your favor and there's good

17   things to say about you.  I've learned a lot about your

18   growing up years.  And they were really difficult ones.

19   You didn't have the kind of support.  It's good to see

20   your dad here supporting you in the way that he has.  You

21   had a health challenge.  Mr. Donovan has helped me

22   understand more about meningitis.  You've had a family

23   that I think is trying to support you, as difficult as it

24   can be.

25         You started your family.  You've got four kids.

1  I've heard about one of them, the troubled one, but

2  there's three others there too, and they really need you.

3         And I also appreciate the fact that you've come

4  into court today and you've talked pretty candidly about

5  how you want to change.  That's a very important first

6  step.  It's oftentimes, as you heard from Mr. Leaming,

7  it's sometimes the only step that somebody takes.  They

8  come into court and talk a good game, and then they're

9  back at it.  I don't know whether that will be true in

10  your case, but it's at least that first step, and that's

11  an important step to make, to be able to say, okay, I

12  understand what's going on here, understand the kind of

13  pattern that I've fallen into.

14         Everybody in this courtroom really hopes that

15  you truly, truly understand and that you'll turn words

16  into actions, that when you get some temptation to make

17  the easy money, you say "No, I'm going to make money the

18  hard way, the honest way."  Just like, frankly, members of

19  your family are doing.  You could do that too.  There's no

20  reason you can't do that.

21         So as I look at everything before me, I'll say,

22  as an initial matter, I am persuaded by your arguments,

23  Mr. Donovan, concerning the criminal history, and I don't

24  discount at all the government's responses, but I do

25  think, as I look especially at the extent of the criminal

1   history, Mr. Martinez, basically you've got 13 points and
2   9 of them accumulated more than ten years ago.  And those
3   offenses, not nearly as serious as the type I often see.
4   I don't look at you and your record here and say this is
5   somebody who is at the very top end of criminal history
6   range in light of when things occurred and what they were.
7   So I do think, in my mind, whether I frame it as either a
8   departure or I would, in equal circumstances, vary for the
9   same reasons essentially to the sentencing range that
10  would correspond to Criminal History Category IV, which
11  would mean a sentencing range essentially of 30 to 37
12  months.

13          That said, when I look at the fact,
14  Mr. Martinez, that you went right back after some period
15  of time after being released, that tells me I would impose
16  a sentence within that range of pretty much near the top
17  because otherwise I'm suggesting, well, yeah, you can go
18  ahead and blow off magistrate judges' orders and sell
19  drugs when you have a GPS ankle bracelet and there's no
20  price to pay for that.  So that tells me from that
21  sentencing range I have, I would impose a sentence near
22  the top of that to make clear to you that there are
23  consequences.

24          Part of the sentence is it's supposed to hurt.
25  It's going to hurt because you're going to be away from

1    family and your four kids, and they all need you, for some

2    longer period of time and it's going to be in some

3    different environment.  It might be in Connecticut; it

4    might not be.

5              On the other hand, it's everybody's hope that

6    you're going to come out and be a much stronger person and

7    do things differently and that we'll hear your success

8    story in the future.

9              So I'll ask you to stand, Mr. Martinez, for

10   purposes of imposition of sentence.

11             Mr. Miguel Martinez, for the reasons I've

12   explained, I'm sentencing you to a term of three years of

13   imprisonment.  That's basically very near the top of that

14   range, adjusted range of the Sentencing Guidelines that I

15   talked about.  And that is on both of the counts, the

16   firearm count and the narcotics count, Counts 10 and 14 of

17   the Indictment.  And the three years will run

18   concurrently, together at the same time.  So it's a total

19   effective sentence of three years of imprisonment.

20             That will be followed by a term of supervised

21   release.  I'm making it four years in your case, a little

22   bit higher in part because I want to make sure, in light

23   of the fact that you have not been involved in drug

24   treatment before and you have not been involved in

25   other -- as intensively as maybe you should have been with

1     mental health counseling.  I want to make sure there's a

2     continuity that you demonstrate there.  So the term of

3     supervised release will be a term of four years of

4     supervised release.

5           I'm not imposing a criminal fine.  I don't think

6     you should be under a monetary obligation.  Basically, you

7     should be building a career, getting that job, building a

8     career, supporting your family, and not be worrying about

9     having to pay money to the government.

10          I will impose the required $200 special

11    assessment.

12          In terms of the conditions -- and I talked to

13    you a little bit before about the many conditions of

14    supervised release.  You'll be subject to the standard

15    conditions under the Sentencing Guidelines of 5D1.3(c).

16          You'll also have mandatory conditions that, of

17    course, you not commit another federal, state, or local

18    offense; that you not unlawfully possess any kind of

19    controlled substance.  That's even marijuana, that's

20    OxyContin, that's any kind of controlled substance.  If

21    you have those, it will be a violation of supervised

22    release.  You'll also be subject to refraining from any

23    unlawful use of a controlled substance and submit to a

24    drug test within 15 days of release on supervised release,

25    and then at least two periodic drug tests thereafter.  The

1  reality is it will be many more than that because you're

2  going to be involved in drug testing and counseling

3  programs.  It will be a lot more than that.  They will be

4  random and they'll detect it if you relapse back.  I'll

5  require that you pay the $200 special assessment if you

6  haven't done so already.  And you'll be subject to having

7  a DNA sample taken from you by the Bureau of Prisons.

8          The special conditions that I talked about, I

9  adopt those very specific conditions that you told me

10 you've read and reviewed from the Presentence Report,

11 Paragraph 76.  That's essentially requiring that you

12 submit to a search if there's a suspicion that you've got

13 any kind of contraband, a reasonable suspicion, in your

14 residence, office, vehicle, even your person.  You'll also

15 have to participate in those programs that we talked about

16 for both substance abuse treatment and also for mental

17 health counseling.  And you're probably a pretty

18 self-reliant person, you probably think, well, who needs a

19 shrink?  If you have that sense of it, I urge you to

20 reconsider that view.  There's not any kind of shame in

21 seeing somebody to talk about how you're thinking about

22 things and what's going on and what are the pressures in

23 your life.  Anybody with four kids and the kind of

24 struggles and stresses that you've had would have those

25 kind of challenges in your life.  So the Probation Office

1    could do everything they can to make a mental health

2    counselor available to you, and also of course the

3    substance abuse program available to you.  If for some

4    reason you come into a lot of money and you're able to

5    pay, you're liable to pay, but otherwise it wouldn't be at

6    your expense.  The last condition I'll add, of course, it

7    should be obvious, is that you not possess any firearm or

8    any ammunition for a firearm or any other dangerous

9    weapon.

10             Do you have any questions at all about those

11   conditions?

12             THE DEFENDANT:  No.

13             THE COURT:  Anything to clarify about those?

14             THE DEFENDANT:  No, Your Honor.

15             THE COURT:  Okay.

16             I'll just ask all counsel, apart from whether

17   you agree with the sentence the Court imposed, any reason

18   the Court cannot lawfully impose it?

19             MR. LEAMING:  No, Your Honor.

20             MR. DONOVAN:  You'll make a recommendation with

21   respect to place of designation?

22             THE COURT:  Certainly.

23             MR. DONOVAN:  But I have no objection to the

24   sentence that Your Honor imposed.

25             THE COURT:  I will make the recommendation for

1   designation -- do you want a recommendation to Danbury

2   itself or to Connecticut or as close as possible to

3   Connecticut?

4           MR. DONOVAN:  I don't know if -- does Danbury, I

5   don't know if Danbury has the residential drug treatment

6   program.

7           THE COURT:  They do.

8           MR. DONOVAN:  I would appreciate a

9   recommendation to Danbury.

10          THE COURT:  I'll make a recommendation to FCI

11  Danbury or as close as possible to Connecticut where there

12  is a residential drug abuse program.

13          MR. DONOVAN:  Thank you, Your Honor.

14          THE COURT:  I'm sure, Mr. Martinez, you know

15  that's just a recommendation.  So the Bureau of Prisons

16  will decide in terms of where ultimately you would be.

17          Okay.  So the judgment of the Court will be

18  prepared for my approval by the Clerk's Office.

19          MR. DONOVAN:  Judge, I'm not sure that you

20  actually said you would recommend that he participate in

21  the drug treatment program.

22          THE COURT:  I will make that recommendation as

23  well.  I realize that he may not qualify, but I'll make

24  the recommendation.

25          MR. DONOVAN:  Thank you, Judge.

1          THE COURT:  Mr. Martinez, you have the right to

2    appeal from your conviction or the sentence that's

3    imposed.  I believe it might be limited by your plea

4    agreement.  But the important thing you need to know is if

5    you think you want to appeal, you need to do so within the

6    next 14 days, because otherwise you will lose the right to

7    appeal.  And if you could not afford counsel for an

8    appeal, you'd have counsel appointed to represent you.  So

9    you want to consult with Mr. Donovan about that promptly,

10   okay?

11         THE DEFENDANT:  Okay.

12         THE COURT:  Is there anything else at this

13   point?  Any counts to dismiss?

14         MR. LEAMING:  I don't believe so, Your Honor.

15         MR. DONOVAN:  No, Your Honor.

16         THE COURT:  Thank you all.  Stand in recess.

17              (Proceedings adjourned at 11:59 a.m.)

18

19

20

21

22

23

24

25

1

2                    C E R T I F I C A T E

3

4        RE: UNITED STATES OF AMERICA v. MIGUEL MARTINEZ

5                     No. 3:18CR90(JAM)

6

7           I, Diana Huntington, RDR, CRR, Official Court

8    Reporter for the United States District Court for the

9    District of Connecticut, do hereby certify that the

10   foregoing pages 1 through 48 are a true and accurate

11   transcription of my shorthand notes taken in the

12   aforementioned matter to the best of my skill and ability.

13

14

15

16

17                    _____/s/_____

18                    DIANA HUNTINGTON, RDR, CRR
                       Official Court Reporter
19                    United States District Court
                       141 Church Street, Room 147
20                    New Haven, Connecticut 06510
                          (860) 463-3180
21

22

23

24

25